J-S01031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: THE ADOPTION OF: D.R.W. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 814 WDA 2022 |

Appeal from the Order Entered April 27, 2022
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s): No. 2021-190 IVT

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.: **FILED: FEBRUARY 7, 2023**

K.A.S. ("Mother") appeals from the order entered April 27, 2022 that involuntarily terminated her parental rights to her daughter, D.R.W., born September 2019 ("Child"), pursuant to the Adoption Act.[1]  We affirm.

On the date of Child's birth, Cambria County Children and Youth Services ("CYS") received a report that Mother had been using crack cocaine and heroin while on methadone maintenance treatment during her pregnancy; that she had failed to attend prenatal medical appointments; and that she failed to take prescribed medicine during the pregnancy.  Upon investigating, CYS also discovered that Mother and Child's father, D.F.W. ("Father," collectively "Parents"), were unable to provide adequate housing for Child.  At the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 23 Pa.C.S. §§ 2101-2938.

hospital, Parents agreed to release Child to reside in a kinship foster home with Father's brother and sister-in-law, pursuant to a safety plan.

On December 5, 2019, Child was determined to be dependent and concurrent placement goals were established of return to Parents and adoption. As part of the permanency plan, Parents were ordered by the juvenile court to abstain from the consumption of drugs and alcohol, submit to random drug testing, attend parenting classes, and cooperate with service providers. A permanency review hearing was held on May 11, 2020, at which Parents were determined to be minimally compliant with their permanency plan. After a second permanency review hearing on November 4, 2020, the court determined that Mother had no compliance with the permanency plan, while Father had only maintained limited compliance. The court changed the placement goal for Child to adoption and found that aggravated circumstances were established as to Parents based upon their failure to maintain substantial and continuing contact with Child. *See* 42 Pa.C.S. §§ 6302, 6341(c.1) (providing that aggravated circumstances may be found where "the identity or whereabouts of the parents is known and the parents have failed to maintain substantial and continuing contact with the child for a period of six months").

CYS filed its petition to involuntarily terminate the parental rights of Parents to Child on February 11, 2021. On May 26, 2021, at the first hearing on the petition, CYS proceeded against Father, who did not appear despite being served with notice of the hearing. Mother asked for a continuance,

which was granted, and CYS presented its case against Mother at hearings on September 13, 2021 and April 20, 2022.[2] At the September 13, 2021 hearing, Abigail Kline, the CYS caseworker assigned to the case, testified that although Mother agreed to a family service plan with CYS that became the basis for the permanency plan in the dependency matter, Mother was not compliant with the plan and she did not show signs of progress towards remedying the issues that led to Child's removal. N.T., 9/13/21, at 10-13. Ms. Kline stated that Mother had made only "[v]ery limited" use of the visitation with Child that was offered to her. *Id.* at 13. As of the date of the September 13, 2021 hearing, Mother had been offered a total of 51 supervised visits at the foster family home or the Bair Foundation Path House, but she had attended only 8 visits.[3] *Id.* at 15-16, 18. Ms. Kline testified that the foster parents offered transportation to their home for visits, but Mother did not follow through and she also did not maintain contact with foster parents to schedule visits. *Id.*

---

[2] Child was represented in the termination of parental rights proceeding by Suzann Lehmier, Esquire; the orphans' court determined that there was no conflict between Child's best interest and legal interest based on her young age and the representations of Attorney Lehmier. Order, 5/26/21; Order, 4/27/22, ¶2; *see also In re K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) ("[W]here an orphans' court has appointed a [guardian *ad litem*]/Counsel to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the orphans' court made a determination that those interests did not conflict.").

[3] This included 2 of 14 visits offered at the foster parent's home, and 6 of 37 visits through Path House, including 1 virtual visit, 1 phone call, and 4 in-person visits. N.T., 9/13/21, at 15. The foster parents requested the cessation of the visits at their home based upon their belief that Mother was under the influence at one of the visits. *Id.* at 51.

at 16, 31-32. Path House also offered transportation to parents for visits, as well as use of a smart phone for video visits while in-person visitation was suspended during the COVID-19 pandemic. *Id.* at 36, 49. Mother was not offered parenting classes by Path House as a result of the fact that she failed to keep up with visitation. *Id.* at 13, 30.

Ms. Kline testified that Mother had been residing in public housing for approximately one year, and that the housing was appropriate for a child; however, Ms. Kline expressed concern that Mother had allowed people who are not named on the lease, including Father, to stay at her residence for long periods, a fact that could result in her eviction if discovered. *Id.* at 18, 25-26, 29. Mother has not cooperated with CYS's designated service providers. *Id.* at 12. While Mother received a psychological evaluation as required by the permanency plan, she did not follow through with the recommendations made during the evaluation. *Id.* at 13.

Ms. Kline stated that Mother has at times submitted to drug screens; however, she has only maintained minimal contact with the agency and therefore it was difficult for CYS to schedule the screens. *Id.* at 12, 54-55. Mother did complete an in-patient recovery program in December 2020, but she subsequently began using drugs again afterwards. *Id.* at 13, 23. On March 16, 2021, Mother tested positive for ecstasy, ethyl glucuronide, and 6-AM, which is a heroin mixture. *Id.* at 13-14. In addition, CYS received a report that, on September 2, 2021, Mother had overdosed on heroin, Narcan

was administered by emergency personnel, and heroin needles were found throughout her apartment. *Id.* at 42-43; CYS Exhibit 18.

Ms. Kline stated that Mother has no bond with Child and therefore termination of Mother's parental rights will not cause any harm to Child. N.T., 9/13/21, at 18-19, 22. On the other hand, Child is "extremely bonded" with her foster parents, as well as their adult son who lives in the home. *Id.* at 17, 22, 24. Furthermore, Child is doing "extremely well" with the foster family, with whom she has resided since birth. *Id.* at 16, 20. The foster parents are able to provide for Child's special needs, which includes attendance at occupational therapy, physical therapy, and speech therapy sessions. *Id.* at 17, 50. In addition, the foster parents are an adoptive resource for Child. *Id.* at 22, 50.

Ms. Kline opined that it would be in Child's best interests for Mother's parental rights to be terminated to allow for Child's adoption by a family that has cared for her and met her needs beginning when she was a few days' old. *Id.* at 20. Ms. Kline stated that Child has never been in the full-time care and custody of Mother, and Mother has either failed or refused to perform parental duties on Child's behalf throughout the duration of the case. *Id.* at 10, 17. Moreover, Ms. Kline had seen no signs that Mother would be able to remedy the issues that led to Child's placement and become a suitable caregiver for Child. *Id.* at 18-19.

Julia Bloom, a family advocate at the Bair Foundation, testified that she began working with Mother on March 6, 2020, when Parents attended the

intake visit with Child at Path House. *Id.* at 57-59. After COVID-19 began spreading throughout the nation in mid-March 2020, Path House began virtual visits; however, Mother remained largely out of contact and refused Ms. Bloom's offer to drive over to Mother's house and pass a smart phone through the door to conduct virtual visits. *Id.* at 59-60, 67, 70. Mother participated in one telephone call with Child in June 2020; although face-to-face visits resumed in July 2020 and Path House offered parents transportation, Mother did not attend any more visits for the remainder of the year, although she was suffering from pneumonia for several weeks during this period and then stayed at a rehabilitation facility in December. *Id.* at 60-63, 66-67.

Mother attended one visit in January 2021 and a second one in March 2021; the latter was the visit where she tested positive for ecstasy, ethyl glucuronide, and 6-AM. *Id.* at 63-64. Mother only attended two more visits between the date of her positive test and the September 13, 2021 hearing, leaving her attendance record at 6 out of a total of 37 scheduled visits with Path House. *Id.* at 58, 65, 67. Ms. Bloom described Mother as "very difficult to get ahold of" throughout the time she worked with her, with Mother regularly offering different reasons for why she was unreachable. *Id.* at 71. Ms. Bloom stated that Mother attempted to play with Child during the visits, but Child played independently and always wanted to know where her foster father or mother was. *Id.* at 65. Ms. Bloom stated that Child is "[a]bsolutely" bonded to her foster parents, but she has not observed any bond developing

between Mother and Child during the handful of visits they had together. *Id.* at 65-68.

When recalled at the April 20, 2022 hearing, Ms. Bloom stated that Mother had attended five of the seven visits offered since the last hearing; she missed one visit without explanation and called to cancel one of the visits she could not attend based upon illness. N.T., 4/20/22, at 7-9. However, Mother tested positive for cocaine, morphine, and her prescribed methadone when given a random screen at the November 15, 2021 visit. *Id.* at 5. Ms. Bloom also requested a drug screen at the March 21, 2022 visit, but Mother was unable to provide a sample, which is treated as a positive result. *Id.* at 6-7. Ms. Bloom stated that Mother behaves appropriately with Child and attempts to play during the visits, but that Child is focused on her foster parent during the visits and does not hug or kiss Mother when Mother asks. *Id.* at 7-9. Ms. Bloom repeated her earlier opinion that she does not see a bond between Mother and Child but that a bond exists with the foster parents. *Id.* at 8.

Dennis Kashurba, a child psychologist, testified that he performed a clinical interview and personality evaluation of Mother on June 10, 2020. *Id.* at 17-19. Mother's lone area of significant evaluation on the personality inventory was for denial, "where high scores typically are obtained from individuals who lack insight into their feelings and the causes of their own behavior." *Id.* at 19. Mother provided Mr. Kashurba with a detailed personal history, including the fact that her four prior children were removed from her

care and placed with the in-laws of the father of those children and that her former partner died of a drug overdose in 2017. *Id.* at 20; CYS Exhibit 17, at 1. Mr. Kashurba's recommendations for Mother included hands-on parent training and family engagement services, supervised visits with Child, continued opioid treatment and drug screens, continued mental health treatment, and home management services to address domestic and financial issues. N.T., 4/20/22, at 21-22. He opined that Mother had adequate intellectual capacity to learn to be a better parent and the appropriateness of her reunification with Child could be evaluated based upon how she performed over time in the recommended areas of improvement. *Id.* at 22-24.

Mother testified at the April 20, 2022 hearing that she has been residing for close to two years in a two-bedroom apartment in public housing in Johnstown, for which she pays approximately $150 to $200 in rent. *Id.* at 26-27. She stated that she has everything she needs in her home to parent Child, including diapers, wipes, clothing, and a crib. *Id.* at 66-67. Mother has worked part-time for the past two years as a cleaner at a barbershop and earns approximately $160 every two weeks in addition to $200 of food stamps she receives every month.[4] *Id.* at 27, 53, 64. Mother stated that she regularly takes medicine to treat anxiety, depression, diabetes, and asthma; she had also been in methadone treatment from approximately September

_____

[4] The owner of the barbershop, who described himself as a surrogate father to Mother, testified and confirmed her employment. N.T., 4/20/22, at 78-81.

2020, and she attended counseling services through the methadone clinic. *Id.* at 28-31, 46-47, 49-50. Mother also completed a parenting class in February 2020, but she admitted that it was not the hands-on parenting class that CYS asked her to attend. *Id.* at 47-48, 63.

Mother stated that she attended approximately seven or eight visits with Child at the foster family's home in the first two months of her life, but the foster family then decided they did not want her in their home. *Id.* at 33-37. After visitation shifted to Path House and then moved online in spring 2020, Mother stated that she was not able to access Zoom on her phone and Ms. Bloom never offered to bring a phone to her home. *Id.* at 38-39, 62. Mother also attributed her inability to attend visits to her battle with pneumonia from August to October 2020 and then her 30-day rehab stay in December 2020. *Id.* at 41-44.

Mother testified that the last time she used opioids was a few days before the September 13, 2021 hearing when she overdosed and that she had not used crack cocaine since her completion of rehab. *Id.* at 31-32. She presented evidence of four negative drug screens through the methadone clinic in February and March of 2022. *Id.* at 51; Mother's Exhibit 5. Mother also denied her positive screens at Path House for opioids in March 2021 and cocaine and morphine in November 2021 and claims that after both of these results she had her methadone clinic retest her and she had no illicit drugs in her system. N.T., 4/20/22, at 52, 58.

Mother admitted that she tested positive for drugs during her pregnancy with Child, including a positive test for cocaine on the date of delivery, but she denied that Child was addicted at birth. *Id.* at 65-66, 77. Mother stated that her drug use was in large part triggered by grief at her prior partner's passing in 2017 from a heroin overdose and that these events also led to the removal and termination of the parental rights as to her other four children. *Id.* at 53-55, 63, 69, 72-73. Mother stated that she is in a better emotional place at the time of the hearing. *Id.* at 54.

Following the hearings, the orphans' court entered its order terminating Mother's parental rights on April 27, 2022.[5] Mother then filed this timely appeal.[6] She raises the following issue on appeal:

> Whether the [orphans' c]ourt either abused its discretion or committed an error of law when it granted the Petition for Involuntary Termination of Parental Rights, thereby terminating the parental rights of [Mother] to [Child].

Mother's Brief at 2.

We apply the following standard of review in this appeal:

---

[5] The orphans' court also terminated Father's parental rights in its April 27, 2022 order. Father did not file an appeal from this order. According to CYS, Father died on October 22, 2022. CYS Brief at 2 n.1.

[6] Mother filed a *pro se* notice of appeal on May 26, 2022, as well as a concurrent concise statement of errors, as required by Pa.R.A.P. 1925(a)(2)(i). On August 2, 2022, this Court filed a *per curiam* order directing Mother's counsel to file an amended concise statement by August 12, 2022. Counsel filed the amended concise statement on that date, and on August 24, 2022, the orphans' court filed an order stating that it was relying on the reasoning set forth in its April 27, 2022 order.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (citation omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination[.]" *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see* 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection

(b), which focuses on the child's needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

Here, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(1) and (2), and subsection (b). However, this Court may affirm the court's decision to terminate if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We focus our analysis on Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>     *      *      *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>     *      *      *
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b).

Under Section 2511(a)(2), "the moving party must prove by clear and convincing evidence that there is (1) repeated and continued incapacity,

abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of L.A.K.*, 265 A.3d 580, 600 (Pa. 2021).

> [S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being.  Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect.  This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re S.C.*, 247 A.3d 1097, 1104-05 (Pa. Super. 2021) (citation omitted).

The grounds for termination under Section 2511(a)(2) are not limited to affirmative misconduct, but also include refusal and parental incapacity that cannot be remedied.  *Id.* at 1104; *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021).  "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties."  *A.H.*, 247 A.3d at 443; *see also In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*), *affirmed*, 240 A.3d 1218 (Pa. 2020) (noting that a parent has an "affirmative duty" to work towards the return of her children, which requires, at a minimum, that she "cooperate with the Child and Youth Agencies and complete the rehabilitative services necessary so that the parent can perform [her] parental duties and responsibilities").  "A parent's vow to

- 13 -

cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **S.C.**, 247 A.3d at 1105 (citation omitted). "[W]hen a parent has demonstrated a continued inability to conduct [her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." **Id.** (citation omitted).

Mother argues that even to the extent that CYS showed that she exhibited a repeated and continued incapacity, abuse, neglect, or refusal to provide essential parental care for Child, the evidence was not sufficient to show that these issues cannot or will be remedied. Mother refers to various efforts she has taken to remedy the issues that led to Child's removal from her care, including distancing herself from Father and obtaining a job and adequate housing. Mother notes that she has made great strides in addressing her drug abuse issues, including regular methadone treatment and attendance at an in-patient rehab program. She further contends that she attempted to maintain contact with Child but her efforts to attend the scheduled visits were stymied for various reasons, including the actions of the foster family, COVID-19 and her inability to attend Zoom visits, her bout with pneumonia, and her completion of rehab.

Upon our review of the record, we find that the record supports the orphans' court's conclusion that CYS met its burden of showing by clear and

convincing evidence that termination of Mother's parental rights to Child was appropriate under Section 2511(a)(2). Mother concedes that CYS satisfied the first two components of the Section 2511(a)(2) analysis. The agency presented ample evidence to show that Mother demonstrated a continuing incapacity to parent Child, who was removed from Mother shortly after birth and not returned throughout the over two-and-one-half-year duration of this case. Mother also failed to consistently attend scheduled visitation to maintain a steady relationship with Child in furtherance of a potential future reunification. Furthermore, Mother's incapacity led to Child being without essential parental care, control, or subsistence, as Child has been in the care of the kinship foster family since leaving the hospital.

Nevertheless, Mother argues that CYS did not prove that her incapacity "will not be remedied," *L.A.K.*, 265 A.3d at 600, pointing to her testimony regarding efforts to address her housing, employment, visitation attendance, and drug abuse. We agree with the orphans' court's finding that Mother's did not demonstrate that she had overcome her failure as a parent. *See* Order, 4/27/22, ¶12. While Mother has made strides, particularly with respect to suitable housing and employment, the primary issue that led to Child's removal is her drug abuse, and she has failed to maintain a consistent period of sobriety to demonstrate her fitness as a parent to the court. Following the filing of the termination petition in February 2021, Mother tested positive for illicit drugs on two occasions at Path House in March and November 2021 and she also failed to provide a sample on a third occasion in March 2022, which

is treated as a positive result. Mother also overdosed on opioids in September 2021, days prior to a hearing on the termination petition. While Mother testified that she had not used cocaine since her December 2020 rehab stint and any opioids beside methadone since her September 2021 overdose, this was belied by her November 2021 drug screen at Path House showing morphine and cocaine in her system. Even to the extent Mother submitted evidence of negative drug screens at her methadone clinic in February and March of 2022, this was called into question by her failure to provide a sample at the March 21, 2022 visit with Child at Path House.

Accordingly, we agree with the orphans' court that CYS demonstrated by clear and convincing evidence that Mother did not demonstrate that she remedied her incapacity to provide parental care to Child by achieving a sustained period of sobriety. As this Court has explained, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities." *In the Matter of M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019) (citation omitted). "The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *Id.* (citation omitted). We thus conclude that the orphans' court did not abuse its discretion in finding that termination of Mother's parental rights to Child was warranted under Section 2511(a)(2).

We next consider whether termination was proper under Section 2511(b), which requires the court to "give primary consideration to the

development, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." **T.S.M.**, 71 A.3d at 267 (citation and quotation marks omitted). The orphans' court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **A.H.**, 247 A.3d at 445 (citation omitted); **see also T.S.M.**, 71 A.3d at 267. "However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." **A.H.**, 247 A.3d at 445 (citation omitted). "Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." **Id.** (citation omitted).

While a parent's emotional bond with the child is a major aspect of the Section 2511(b) analysis, "it is nonetheless only one of many factors to be considered by the [orphans'] court when determining what is in the best interest of the child." **S.C.**, 247 A.3d at 1110 (citation and emphasis omitted). Our Supreme Court has instructed that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **T.S.M.**, 71 A.3d at 268.

In finding that termination of Mother's parental rights would best meet the developmental, physical, and emotional needs and welfare of Child, the orphans' court noted that Child has never been in Mother's care and Mother

has never performed parental responsibilities for Child who was two-and-one-half years' old at the time of the court's ruling. Order, 4/27/22, ¶¶15-16. The court observed that Mother has not maintained meaningful contact with Child as she had only attended 13 out of 58 total visits since Child's removal. *Id.* ¶15. The court thus found that no bond presently exists between Mother and Child. *Id.* This conclusion is supported by the testimony of Ms. Kline, the CYS caseworker, and Ms. Bloom, the Bair Foundation family advocate, at the September 13, 2021 hearing that they observed no bond between Mother and Child during their interactions together. Further, Ms. Bloom opined at the April 20, 2022 hearing that, even after five additional visits, Child did not appear to be attached to Mother and there was no apparent bond between the two.

The orphans' court contrasted the absence of a Mother-Child bond with the care and support provided to Child by the kinship foster family who have been providing for Child's needs and welfare for essentially her entire life, including Child's special needs resulting from her pre-natal drug exposure. The court explained that Child "is thriving in her placement" with the foster family, who "love[] her and are providing for all of her needs." *Id.* The court stated that, with the termination of Parents' parental rights and Child's planned adoption by the foster family, Child "will have the opportunity to be raised by a family who is capable of meeting all of her physical, mental, emotional, moral, social, educational, safety, and medical needs." *Id.*

We discern no abuse of discretion in the orphans' court's Section 2511(b) analysis. The testimony of the CYS witnesses established that no meaningful bond exists between Mother and Child, while there is a very strong bond between Child and her foster parents, who love and care for her and provide for all of her needs. Clear and convincing evidence thus supports the court's determination that the termination of Mother's parental rights would be in the best interests of Child under Section 2511(b). Accordingly, we affirm the involuntary termination of Mother's parental rights to Child pursuant to Sections 2511(a)(2) and (b).

Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/7/2023